# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Joan B. Gottschall | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 02 C 6153 | **DATE** | 10/18/2004 |
| **CASE TITLE** | Kegan Peart vs. Mueller Streamline Co., et al. | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

Defendants' motion for partial summary judgment [29-1].

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]
(2) ☐ Brief in support of motion due _____.
(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.
(4) ☐ Ruling/Hearing on _____ set for _____ at _____.
(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(7) ☐ Trial[set for/re-set for] on _____ at _____.
(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.
(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
   ☐ FRCP4(m)   ☐ Local Rule 41.1   ☐ FRCP41(a)(1)   ☐ FRCP41(a)(2).
(10) ■ [Other docket entry] Enter Memorandum Opinion to defendants' motion for partial summary judgment [29-1] as stated in minute order dated 09/30/04.

(11) ■ [For further detail see order attached to the original minute order.]

| | | | | |
|---|---|---|---|---|
| | No notices required, advised in open court. | | | Document Number |
| | No notices required. | | number of notices | |
| | Notices mailed by judge's staff. | | | |
| | Notified counsel by telephone. | | OCT 19 2004 date docketed | |
| x | Docketing to mail notices. | | JXM docketing deputy initials | 47 |
| | Mail AO 450 form. | | | |
| | Copy to judge/magistrate judge. | U.S. DISTRICT COURT | | |
| RJ/MJ | courtroom deputy's initials | 2004 OCT 18 PM 1:24 | date mailed notice | |
| | | Date/time received in central Clerk's Office | mailing deputy initials | |

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

KEGAN PEART, )
)
Plaintiff, )
) Case No. 02 C 6153
v. )
) Honorable Joan B. Gottschall
MUELLER STREAMLINE CO., and )
DEBORAH JONES, )
)
Defendants. )

**DOCKETED**
OCT 1 9 2004

## MEMORANDUM OPINION & ORDER

The Defendants Mueller Streamline Co. and Deborah Jones have moved for partial summary judgment on: (1) all of Plaintiff's Title VII claims against Defendant Jones, (2) Plaintiff's race discrimination and retaliation claims relating to his suspension against Mueller, (3) Plaintiff's race discrimination claim relating to his denial of a "lead person" position, and (4) Plaintiff's intentional infliction of emotional distress claim. The defendants are entitled to summary judgment on only the first two of these grounds, and so the motion is granted in part.

## I. Facts

Mueller Streamline Co. is a Tennessee-based corporation that manufactures and distributes tubes and fittings. It fills orders for pipe-fittings from its Addison, Illinois, distribution center. Kegan Peart worked for Mueller in Addison as a warehouse worker from 1999 to August 8, 2002. His duties were picking, packing and auditing orders, and sending orders out via UPS. All warehouse workers were members of the Teamsters. The other employees at the site were Deborah Jones, the warehouse manager, and her administrative assistant, Diane McClendon. Evidence about the racial makeup of the employees and number of employees during Peart's tenure is disputed.

1

At the time Peart worked at the warehouse, Jones appointed one of the workers to be a "lead person" in the warehouse. The lead person was a sort of team leader. The parties dispute whether the lead person received any extra pay for the job, but it is clear that the lead person did not have the authority to hire, fire, or discipline other employees. While the evidence put forward by the parties clearly shows that the lead person had some extra responsibilities, corresponding benefits are far more nebulous, if present at all. The Defendants deny that the position was supervisory, but in an internal email exchange Jones referred to the position as supervisory, and when the position was eliminated, she discussed with her supervisor whether the person who was to be stripped of the title would view it as a demotion. Norma Marines, a Hispanic, was installed as lead person in 2000, but Peart complains that he should have been installed instead of her. After Marines stepped down as lead person, Ernesto Reyes became lead person. Peart did not apply for lead person at that time because he did not want to change to the second shift as he would have had to do if he became lead person.

During Peart's tenure "NIGA" graffiti was written in marker on walls and racks in the warehouse at least 15 times between the Spring 2001 and Fall 2002. Peart and Jones both understood it to be racially offensive. Peart claims that the graffiti would stay up for three months at a time, and that Jones reacted to his complaints about the graffiti by accusing him of writing it. Jones denies this and claims that the graffiti was eliminated immediately when she saw it. She also claims that she held a meeting after the first graffiti went up. At the meeting, she told the employees not to write anything on the walls, and to report graffiti so she could remove it. She says she then spent more time in the parts of the warehouse where the graffiti appeared. She consulted the corporate office and states that a manager from the Tennessee headquarters attended a meeting and

2

told workers that the one responsible for the graffiti would be fired. Peart denies that there were any meetings about the graffiti.

Peart was suspended for two days after he was involved in a confrontation with Eliseo Covarrubias, a Hispanic employee. The parties dispute what happened during this confrontation. Peart refers to it as an "attack," in which he was struck by a cardboard box kicked by Covarrubias. Norma Marines and Denis Walker were two warehouse workers who saw the fight. Their deposition testimony, when synthesized, suggests that Covarrubias kicked the box at Peart and pushed him away because Peart was nearly on top of Covarrubias during a verbal dispute about a cardboard box. Jones testified that when she saw the two of them, they were nose to nose and about to start throwing punches. Jones made the workers shake hands and go back to work. Peart found this resolution unsatisfactory and called the police to the worksite. After this, Jones suspended both Peart and Covarrubias for fighting. Jones asserts that she was planning on suspending the two from the moment she saw them about to fight; Peart claims that she decided to suspend them only after he called the police.

Peart also complains that Eliseo Covarrubias and Ernesto Reyes called him names on a daily basis "for a while," mainly after this confrontation and the suspension. Jones stated that name calling was brought to her attention only a couple of times. She stated that she did not tolerate name calling at the warehouse and that she brought up the name calling at employee meetings.

Peart complains about a number of Jones' acts and statements. For example, Peart complains that Jones told him on several occasions when he presented grievances to her that it was "her warehouse" and she could do what she pleased. Further, he states that Jones told him to "take it to the EEOC" on a couple of occasions when he complained of discriminatory acts. Peart complains

that Jones "harassed" him by following him around the warehouse while he was filling orders. Jones states that she was merely observing his work and that she did this to all employees from time to time. Finally, Peart complains that Jones brought her three dogs to work with her on a regular basis, one of which was a large sixty-five pound dog. He states that the dogs would jump on him. Jones admits that she brought her dogs in from time to time, but states that they were not allowed to roam free around the warehouse. Peart complained to Jones that he had a great fear of dogs, but the parties dispute whether she continued to bring them to work after Peart's complaint.

## II. Analysis

Summary judgment is appropriate when the parties' filings demonstrate that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). Facts are construed in the light most favorable to the non-moving party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

### A. Title VII claims against Jones

Jones moves for summary judgment on the Plaintiff's Title VII claims against her on the ground that she is not an "employer" under the act. The evidence shows that Jones was merely Peart's supervisor at Mueller, and she did not independently employ Peart. Supervisors cannot be held individually liable under Title VII, and so Jones is entitled to summary judgment on all Title VII claims asserted against her. *See Silk v. City of Chicago*, 194 F.3d 788, 797 n.5 (7th Cir. 1999); *Williams v. Banning*, 72 F.3d 552, 554-55 (7th Cir. 1995). However, individuals can be held liable for race discrimination under 42 U.S.C. § 1981, and thus Peart's § 1981 racial discrimination claims against Jones survive.

## B. Claims relating to Peart's suspension

Peart raises claims under both Title VII and § 1981 that his suspension after the confrontation with Covarrubias was due to either his race, or retaliation for asserting his rights. The liability analysis is identical for both a Title VII claim and a § 1981 claim. *See Gonzalez v. Ingersoll Milling Mach. Co.*, 133 F.3d 1025, 1033 (7th Cir. 1998).

### 1. Race discrimination

Peart has not produced any direct evidence of race discrimination related to his suspension, so Peart must produce indirect evidence to satisfy his burden. This requires him to first show that (1) he is a member of a protected class, (2) he was meeting his employer's legitimate performance expectations, (3) he suffered an adverse employment action, and (4) his employer treated similarly situated employees outside of the protected class more favorably. *Davis v. Con-Way Trans. Central Express, Inc.*, 368 F.3d 776 (7th Cir. 2004). The Defendants challenge only the fourth element, that similarly situated non-African-Americans were treated differently. Both participants in the fight–Peart, who is African-American, and Covarrubias, who is Hispanic–were suspended, and thus, Defendants argue, Peart was treated the same as the only similarly situated party. Peart presents evidence in response that Ernesto Reyes, a Hispanic warehouse worker, made "threatening gestures" toward Andre Mendenhall, an African-American, and Dennis Walker, a Caucasian, but was not disciplined, while Mendenhall did the same to Reyes and was disciplined.

Similarly situated employees are employees who are similar with respect to "performance, qualifications and conduct." *Snipes v. Illinois Dept. of Corrections*, 291 F.3d 460, 463 (7th Cir. 2002). Normally, this requires that "the two employees dealt with the same supervisor, were subject to the same standards, and had engaged in similar conduct without such differentiating or mitigating

5

circumstances as would distinguish their conduct or the employer's treatment of them." *Radue v. Kimberly-Clark Corp.*, 219 F.3d 612, 617-18 (7th Cir. 2000). All of the employees invoked by both the Defendants and Peart shared the same supervisor. But they did not all engage in the same conduct. The threatening gestures cited by Peart are not the same as the impending fight for which he was suspended. Peart's deposition testimony is that Covarrubias kicked a box at him and pushed him. Jones stated at her deposition that when she saw Peart and Covarrubias, they were nose-to-nose and looked as if they were about to start throwing punches. Moreover, Peart called the police to his worksite after the fight ended, and so Peart and Covarrubias's encounter caused a much bigger workplace disturbance than the incidents on which Peart relies. Thus, the only similarly situated non-African-American who has been presented by either side is Covarrubias, Jones' adversary in the dispute. It is undisputed that both Peart and Covarrubias received similar punishments for the incident, and therefore, Peart fails to establish a *prima facie* case of discrimination in connection with his suspension.

### 2. Retaliation

Under either the direct or indirect method of establishing retaliation, a retaliatory act must be a response to statutorily protected activity. *See Stone v. City of Indianapolis Public Utilities Div.*, 281 F.3d 640, 644 (7th Cir. 2002). The statutorily protected activities listed in Title VII are opposition to illegal discrimination and participation in a Title VII investigation or claim. *See* 42 U.S.C. § 2000e-3(a). Peart claims that he was suspended for calling the police to the worksite, and that he would not have been suspended for the confrontation with Covarrubias. But Peart does not present any authority to support the notion that his call to the police was opposition to an illegal employment practice, as that concept is construed as a matter of federal law, much less that the call

6

to the police was involved with a Title VII investigation. Moreover, no evidence in the record suggests a racial motivation for the dispute with Covarrubias. So even if Peart is correct about the reason for his suspension, there is insufficient evidence of any relation to a statutorily protected activity. Thus, Peart cannot show the presence of a dispute of material fact relating to his claim of unlawful retaliation.

## C. Claims relating to Peart's failure to become "lead person"

Peart claims that he was not promoted to "lead person" at the warehouse because of his race. The Defendants argue that Peart does not present a *prima facie* case because the failure to become lead person was not an adverse employment action. The Defendants point to two other cases in this district involving this same position at the Addison warehouse, where judges of this circuit have granted summary judgment on this ground. *See Walker v. Mueller Industries, Inc.*, No. 02 C 6615, 2003 WL 22410081 (N.D.Ill. Oct. 21, 2003) (Coar, J.); *Mendenhall v. Mueller Streamline Co.*, No. 01 C 9740, 2003 WL 187405 (N.D.Ill. Jan 28, 2003) (Kocoras, C.J.). Peart claims that the evidence before this court is different from the evidence before the other courts, so those decisions do not foreclose his claim.

Peart points to no direct evidence of race discrimination regarding his failure to become lead person, so he must show discrimination by the indirect method to survive summary judgment. The only disputed material in the *prima facie* case is whether the denial of the lead person position was an adverse employment action. An adverse employment action must be materially adverse. *See Hilt-Dyson v. City of Chicago*, 282 F.3d 456, 465 (7th Cir. 2002). A failure to promote meets this standard, but the Defendants claim that the lead person did not have a higher salary or different job responsibilities. But while the union contract does not provide for a higher salary, there is evidence

7

in the record that Marines received a higher salary than called for in the union contract while she was lead person. Further the record before the court in this case contains evidence that the lead person had some supervisory powers denied the ordinary warehouse worker. The lead person stood in the warehouse manager's position on days when the manager was absent. Marines stated that on those days she had authority to send workers home in the event that the workers did not obey her directions or if they were fighting. And, in email, Jones referred to the position as supervisory. Further, it appears from the record before this court that employees at Mueller viewed at the position as a desirable plum, and that the lead person had status among the employees. On this record, and without knowledge of the details of the evidence considered by the other judges who have ruled on this issue, this court is unwilling to foreclose the possibility that Peart could establish an adverse action in the denial of the lead person position. Summary judgment therefore cannot be granted on any element in plaintiff's *prima facie* case.

This means that the burden shifts to the Defendants to offer a legitimate non-discriminatory reason for making Marines lead person instead of Peart. *Davis*, 368 F.3d at 784. The Defendants point to Jones's belief that Marines was the most qualified to be lead person. She stated that the lead person's qualifications were knowledge of warehouse functions, and having the trust and respect of coworkers. The Defendants, however, do not show any evidence that clarifies how Marines was superior to Peart in these areas.

Peart argues, as he must, that the Defendants' proffered reason is pretext for discrimination. Peart must therefore show that Jones lied when she stated her reason for appointing Marines. *See Little v. Illinois Dept. of Revenue*, 369 F.3d 1007, 1013 (7th Cir. 2004). He points to the deposition of Jones' assistant Diane McClendon, who testified that Jones hired the lead person based on

seniority and experience. He also points to Marines' erratic attendance record and lesser fluency in English to show that Jones could not have believed that Marines was more qualified. Further, Peart claims that Marines' successor, Ernesto Reyes, did not know all warehouse functions because he could not operate a computer. The inconsistent statements in the record about the criteria for selecting the lead person position, plus the fact that Jones may not have consistently used what she claimed to be her criteria for lead person, create a triable issue on whether the Defendants' reason for not making Peart the lead person was pretext for discrimination.

## D. Intentional Infliction of Emotional Distress

The final claim on which the Defendants seek summary judgement is Peart's intentional infliction of emotional dismiss claim. Under Illinois law, intentional infliction of emotional distress has three elements. First, the defendants' conduct must be "so extreme as to go beyond all possible bounds of decency and to be regarded as intolerable in a civilized community." *Feltmeier v. Feltmeier*, 798 N.E.2d 75, 80-81 (Ill. 2003); *see also* Restatement (Second) Torts § 46, cmt. d, at 73 (1965) ("recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, 'Outrageous!'"). Second, the defendants' must either intend their conduct to inflict severe emotional distress or know that their conduct has a high probability of causing severe emotional distress. *See Doe v. Calumet City*, 641 N.E.2d 498, 507 (Ill. 1994). Third, the conduct must actually cause severe emotion distress. *See McGrath v. Fahey*, 533 N.E.2d 806, 809 (Ill. 1988). Illinois courts generally hesitate to find conduct occurring as part of the employer-employee relationship to meet the standards of this tort. *See Graham v. Commonwealth Edison*, 742 N.E.2d 858, 867 (Ill.App.Ct. 2000); *Vickers v. Abbott Laboratories*, 719 N.E.2d 1101, 1115 (Ill.App.Ct. 1999). "[I]f everyday job stresses resulting from discipline, personality conflicts,

job transfers or even terminations could give rise to a cause of action for intentional infliction of emotional distress, nearly every employee would have a cause of action." *Graham*, 742 N.E.2d at 867.

Under the high standards set by the Illinois courts, only one of the Plaintiff's assertions of extreme and outrageous behavior meets the standards of this tort. If, as plaintiff states, the Defendants did not take any reasonable steps to prevent or remove racist graffiti from the walls and racks in the warehouse (this is a disputed issue of fact), a jury could reasonably find that the conduct was extreme and offensive. Racist graffiti is not an everyday job stress, and management's failure to take appropriate action in response is not an "ordinary indignity." If, as Peart states, Jones did not remove graffiti even after Peart complained about it, he succeeds in presenting a genuine issue of material fact on the second element of the tort. Jones admits that the graffiti was offensive, and it is not at all a stretch to conclude that she would know that leaving the offensive racist graffiti on the walls would be highly likely to cause severe emotional distress to Peart.

Defendants' cases fail to demonstrate that their conduct was not outrageous as a matter of law. *Oates v. Discovery Zone*, 116 F.3d 1161 (7th Cir. 1997), is not to the contrary. In that case, the court found the plaintiff's allegations insufficiently extreme, but noted that the refusal to remove a racially discriminatory wall hanging could meet the standard. *See id.* at 1174. The court rested its grant of summary judgment primarily on the fact that it was "but one relatively isolated incident of racial insensitivity" *Id.* at 1175. In this case, however, Peart states that the racial graffiti occurred many times over a prolonged period. Unlike in *Oates*, in this case it is undisputed that the graffiti was racially motivated. And while it is true that not all allegations of racially biased conduct are outrageous enough to satisfy the requirements of this tort, the racist graffiti in this case is clearly of

a more menacing, unacceptable character than that the conduct alleged by the plaintiffs in the two unreported cases cited by the Defendants. *See Poulous v. Village of Lindenhurst*, No. 00 C 5603, 2002 WL 31001876 (N.D.Ill. Sep. 3, 2002); *Serritella v. Midwest Dental Products Corp.*, No. 95 C 2179, 1996 WL 495563 (N.D.Ill. Aug. 28, 1996).

While the Defendants challenge Peart's showing that he suffered severe emotional distress, looking at the record in the light most favorable to Peart, his statements at his deposition regarding his distress are sufficient to establish a triable issue on the third element of the tort. Illinois law requires actionable emotional stress to be "so severe that no reasonable man could endure it." *McGrath*, 533 N.E.2d at 809. The duration and intensity of the distress are relevant factors here. *Id.* Peart claimed that the emotional symptoms he experienced included negativity, loss of confidence and anger. He also claimed that he is "not the same person" as he was before he started working at Mueller because he had never been exposed to racism previously. While this may seem similar to the rejected claim of emotional distress in *Cavalieri-Conway v. L. Butterman & Assoc.*, 992 F.Supp. 995, 1010-11 (N.D.Ill. 1998), the cold record that is before the court at summary judgment in this case is too ambiguous to support a grant of summary judgment; all it may show is that Peart is not the most articulate person. Further, the presence of deposition testimony relating to Peart's emotional distress makes this case unlike *Bennington v. Catepillar, Inc.*, 275 F.3d 654, 661 (7th Cir. 2001), in which the plaintiff provided no evidence of any kind of emotional distress. Inferences must be drawn in Peart's favor at this stage of litigation and doing so makes it impossible to grant summary judgment against him.

Peart's other allegations of emotional distress essentially amount to a claim that his supervisor was insensitive, but that is one of the risks one must shoulder as an employee in the

11

everyday work world. *See McGrath*, 533 N.E.2d at 809 ("the tort does not extend to 'mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities,'" *quoting* Restatement (Second) Torts § 46, cmt. d). The only other allegation of substance is his claim that Jones accused him of trying to steal from the warehouse. But this conduct fails to meet the standard for outrageous conduct because the evidence shows that the "accusation" was connected with an undisputed attempted theft at the warehouse. The attempted theft was reported to the police, and while Jones was talking with the police about the circumstances surrounding the theft, she mentioned Peart's name to the police because she believed that he was the only warehouse worker present at the time of the incident. Cooperating with police investigating an alleged theft is a reasonable employer objective, *See Gibson v. Chemical Card Services Corp.*, 510 N.E.2d 37, 41-42 (Ill.App.Ct. 1987). Plaintiff provides no evidence to rebut Jones' claim that Peart was the only employee at the warehouse. Jones's statement to the police in these circumstances is not outrageous.

## III. Conclusion

Defendants' motion for partial summary judgment is granted in part. Defendants are entitled to summary judgment on counts one and two to the extent that they assert that Defendant Jones is liable under Title VII, and to the extent that the counts rely on Plaintiff's suspension. Summary judgment is denied on Peart's failure to promote claim and on count three of the complaint.

ENTER:

JOAN B. GOTTSCHALL
United States District Judge

DATED: October 18, 2004